# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 12, 2014

## STATE OF TENNESSEE v. ARTHUR RAY TURNER

**Direct Appeal from the Criminal Court for Davidson County**
**No. 95-C-1691      Steve Dozier, Judge**

**No. M2013-00277-CCA-R3-CD - Filed May 28, 2014**

In this procedurally complex case, a Davidson County jury convicted the Defendant, Arthur Ray Turner, of especially aggravated kidnapping, aggravated robbery, four counts of aggravated rape, and attempted aggravated rape. The trial court sentenced the Defendant to a total effective sentence of seventy years in confinement. On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to suppress his statements to police; (2) the trial court erred when it denied his motion to dismiss based upon the State's destruction of evidence; (3) the trial court erred when it ruled on the admissibility of DNA evidence; (4) the evidence is insufficient to sustain his conviction for two counts of aggravated rape because the State did not prove that he was armed with a weapon or anything the victim reasonably believed was a weapon; (5) the trial court erred when it allowed separate convictions for aggravated rape in Counts 3 and 4 and attempted aggravated rape in Count 5 because separate convictions violate his protections against double jeopardy; (6) the trial court erred when it ordered his sentences to run consecutively and when it ordered him to serve his sentence for especially aggravated kidnapping at 100 percent. After a thorough review of the record and applicable authorities, we affirm the trial court's judgments in all respects save one. The trial court's judgment in Count 1, especially aggravated kidnapping, should be modified to reflect a release eligibility date of 30 percent.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and JEFFREY S. BIVINS, JJ., joined.

Jeffrey A. DeVasher, Assistant Public Defender (on appeal), Jon Wing and Kevin Griffith, Assistant Public Defenders (at trial), Nashville, Tennessee, for the Appellant, Arthur Ray Turner.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Bradshaw, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Pamela Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## I. Facts
## A. Procedural History

This case arises from the kidnapping and rape of the victim. The Defendant was originally indicted in this case by the Davidson County grand jury in July 1995. This Court previously stated about this case:

It appears from the record before us that in 1995 the [Defendant], pursuant to a plea agreement, entered guilty pleas to especially aggravated kidnapping, aggravated robbery and two counts of aggravated rape. He was sentenced to twenty years for each of his aggravated rape convictions and ten years for his especially aggravated kidnapping and aggravated robbery convictions. Thereafter, the trial court ordered the [Defendant]'s sentences to run concurrent, except for the rape sentences which were to run consecutive for an effective sentence of forty years. In April 1996, the [Defendant] filed a petition for post-conviction relief, alleging ineffective assistance of counsel and improper imposition of consecutive sentences. The petition was dismissed and this court affirmed the dismissal on appeal. *See Arthur R. Turner v. State*, No. 01C01-9707-CR-00274, 1998 WL 652154 (Tenn. Crim. App., at Nashville, Sept. 23, 1998) *perm. app. denied* (Tenn. March 22, 1999). Subsequently, the [Defendant] unsuccessfully filed a series of petitions seeking post-conviction relief. *See, e.g., Author R. Turner v. State*, No. M2002-00541-CCA-R3-PC, 2003 WL 1877035 (Tenn. Crim. App., at Nashville, April 15, 2003) *perm. app. denied* (Tenn. Sept. 2, 2003) (petition for relief barred by statute of limitations). The [Defendant] also unsuccessfully sought post-conviction relief in the federal district court via petition for writ of habeas corpus. *See, e.g., Author Ray Turner v. Stephen Dotson*, Warden, No. 06-5121, 2007 Fed. App. 0179N (6th Cir. Tenn. Mar. 6, 2007) (petition for relief barred by statute of limitations).

*Author Ray Turner v. Stephen Dotson*, No. W2008-00011-CCA-R3-HC, 2008 WL 4253644, at *1 (Tenn. Crim. App., at Jackson, Sept. 16, 2008), *no Tenn. R. App. P. 11 application*

*filed.*[1]

On December 6, 2007, the Defendant filed a petition for writ of habeas corpus, alleging that he received an illegal sentence because he was sentenced beyond the presumptive minimum sentence on each of his convictions to which he pled guilty in violation of his Sixth Amendment right to a jury trial as set forth in *Blakely v. Washington*, 542 U.S. 296 (2004) and its progeny. The habeas court summarily dismissed the Defendant's petition, and this Court affirmed the habeas court's judgment. *Turner v. Dotson*, 2008 WL 4253644, at *3.

On December 9, 2008, the Defendant filed a petition for habeas corpus relief again challenging the legality of his sentence. *Arthur Ray Turner v. David Mills*, No. E2009-00194-CCA-R3-HC, 2010 WL 1949143, at *1 (Tenn. Crim. App., at Knoxville, May 13, 2010), *no Tenn. R. App. P. 11 application filed*. The Defendant argued that his sentences and corresponding judgments, which reflected a thirty percent release eligibility for each conviction, directly contradict the statutory mandate of Tennessee Code Annotated section 39-13-523 that any offender convicted of two counts of aggravated rape "shall be required to serve the entire sentence imposed by the court." T.C.A. § 39-13-523(a)(2), (b) (Supp.1994). The habeas corpus court dismissed the petition, and we reversed its judgment. *Turner v. Mills*, 2010 WL 1949143, at *4. We concluded that the Defendant's sentences for aggravated rape were illegal on the face of the judgments because they contravened a statute. *Id.* Accordingly, we reversed the judgment of the habeas corpus court summarily dismissing the petition for writ of habeas corpus and remanded the case to that court for the appointment of counsel and an evidentiary hearing to determine whether the Defendant was entitled to withdraw his guilty plea. *Id.* In so doing, the Court stated:

> At [the evidentiary] hearing, the issue would be whether the illegal sentence was a material element of a plea agreement with the State, and the proof would be limited to the face of the record of the underlying proceedings. If the record establishes that the illegal sentence was not a bargained-for element of the plea agreement, then, as in *Smith*, the sentence is void, but the conviction remains intact, and the only remedy is correction of the sentence. If the record establishes that the illegal sentence was a material part of a package deal, then the petitioner is entitled to withdraw his plea if he cannot reach an agreement with the State. *See McConnell v. State*, 12 S.W.3d 795, 800 (Tenn. 2000) (holding that withdrawal of the guilty plea is unnecessary when the parties agree to replace an illegal sentence with a legal one).

---

[1] It appears that there is a discrepancy in the Defendant's name; however, the record herein indicates that his name is Arthur Ray Turner.

3

*Id.* at *3-4 (quoting *Summers v. Fortner*, 267 S.W.3d 1, 6-7 (Tenn. Crim. App. 2008)).

On remand and following the evidentiary hearing, the habeas corpus court entered a December 10, 2010, order granting the Defendant habeas corpus relief:

> After reviewing (1) the petition and its attachments, (2) the respondent's motion to dismiss, (3) the opinion of the Court of Criminal Appeals remanding the case to this Court for the appointment of counsel, (4) the [Defendant]'s amended petition, and (5) the record in this case, and after conducting a hearing on October 25, 2010, in Kingston by agreement of the parties, the Court is of the opinion that the petition for writ of habeas corpus is well-taken and should be granted. The Court of Criminal Appeals previously concluded that the [Defendant]'s two judgments of conviction for aggravated rape are void because the petitioner was not ordered to serve his sentences at 100 percent as a multiple rapist, as required by [Tennessee Code Annotated section] 39-13-523. That court remanded the case for this Court to determine "whether the original 30 percent release eligibility was a material bargained-for element of the [Defendant]'s plea agreement." This Court now finds that the [Defendant]'s original 30 percent release eligibility was a material bargained-for element of the [Defendant]'s plea agreement.
>
> Accordingly, it is ordered, adjudicated, and decreed that the petition for writ of habeas corpus is GRANTED, and the case is TRANSFERRED to the Davidson County Criminal Court for further proceedings. Since "the record establishes that the illegal sentence was a material part of a package deal, then the petitioner is entitled to withdraw his plea if he cannot reach an agreement with the State." *Summers v. Fortner*, 267 S.W.3d 1, 7 (Tenn. Crim. App. 2008) (citing *McConnell v. State*, 12 S.W.3d 795, 800 (Tenn. 2000)).

The State appealed. This Court affirmed the habeas corpus court's judgment allowing the Defendant to withdraw his guilty plea. *Arthur Ray Turner v. David Mills*, E2011-000740CCA-R3-HC, 2012 WL 1431220, at *1 (Tenn. Crim. App., at Knoxville, Apr. 25, 2012), *no Tenn. R. App. P. 11 application filed*. The case then proceeded to trial.

### B. Facts
### 1. Motion to Suppress

On March 16, 2012, the Defendant filed a motion to suppress his statements to police. At a hearing on the motion, the parties presented the following evidence: Charles Thomas, a detective with the Rutherford County Sheriff's Office, testified that he was dispatched to

4

7822 Clearwater Court on March 16, 1995, and there he encountered the Defendant. Detective Thomas said that, when he arrived at the house he knocked on the door, and a woman named Tanya Johnson answered the door. The Defendant was asleep in the bedroom. The detective asked the Defendant to step outside, where he read the Defendant his *Miranda* warnings. After so doing, the detective offered the Defendant an opportunity to tell him his side of the story. Detective Thomas documented the Defendant's statement.

The Defendant told Detective Thomas that he needed a ride to Rutherford County, so he kidnapped a lady, put her in the trunk, and brought her to Rutherford County. Another detective, Commander Acton, asked the Defendant if he had raped the woman, and the Defendant stated that he had. The Defendant told the detectives that he planned to release the woman.

During cross-examination, Detective Thomas testified that he received the call about a kidnapping and rape at around 10 a.m. on March 16, 1995. He understood that this was a serious situation, and he initially responded to the location of the victim, which was a house near where she said the Defendant had parked her car with her in the trunk. The victim told him what had happened and pointed out her car, which was located at the Clearwater address. The detective said that he knew that the Defendant potentially had a gun. Detective Thomas said that four officers approached the house and treated the call as a possible "emergency call."

Detective Thomas said that he did not have his gun drawn when he knocked on Ms. Johnson's door. When Ms. Johnson answered the door, he asked her whose car was in the driveway. She said it was her friend's cousin. She pointed to a bedroom and walked toward the bedroom to talk to someone there. Detective Thomas and Detective Mark Warf followed her, and they found the Defendant asleep. They woke the Defendant and escorted him outside. Detective Thomas then briefly looked for a gun. Detective Thomas said that he believed another detective, Commander Amanda Preble Acton, was present when the Defendant admitted to the kidnapping and rape.

Amanda Preble Acton, a commander with the Rutherford County Sheriff's Department, testified that she responded to the call in this case. She confirmed Detective Thomas's account of the events, adding that she was outside looking in the victim's car for potential evidence while Detective Thomas went inside the house. She saw the Defendant being escorted from the home, and she was present when the Defendant made a statement to police admitting that he had "taken a lady." Commander Acton asked the Defendant if he had raped the victim, and the Defendant responded, "[Y]es." Commander Acton testified that she never saw anyone use any signs of threat or coercion to induce the Defendant to make these statements.

5

Commander Acton testified that the Defendant was brought to the interview room at the police department for a video-recorded interview. Detective Warf was the primary interviewer at that time, and he confirmed on the recording that the Defendant had been given his *Miranda* warnings previously by another officer. The Commander joined them about forty-five or fifty minutes into the interview. The State offered the video recording of the interview, an additional enhanced audio recording of the interview, and also a transcript of the interview. The State also offered a photocopy of a handwritten statement written by the Defendant during the video-recorded interview.

During cross-examination, Commander Acton testified that, when they responded to the Clearwater address, all the officers had their hands on their guns because they had been told a gun was involved in the kidnapping. The commander did not hear Detective Thomas give the Defendant his *Miranda* warnings, but Detective Thomas told her that he had done so. Commander Acton said that, in addition to the Defendant, the woman who answered the door at the Clearwater address was also brought to the police station, where she gave a statement.

The Defendant testified that he was eighteen years old at the time he was arrested. He had completed the tenth grade in school and had been expelled before he completed the eleventh grade. The Defendant said he could read and perform arithmetic.

The Defendant testified that he had been arrested prior to his arrest in this case but only for "[m]isdemeanors mostly, no felonies." He said that, before his arrest in this case, he had been read his *Miranda* rights on one or two previous occasions. The Defendant described March 16, 1995, saying that in the morning, he was arrested at the residence of his girlfriend, Tanya Renee Johnson, on Clearwater Court. At the time, he was walking in the kitchen following Ms. Johnson who had awoken him to tell him that there were police officers at the house. In the kitchen, the Defendant saw three or four police officers in plain clothes. All the officers had their guns out and pointed at him, yelling for him to stop and to get on the ground. The Defendant said he complied, and an officer asked him if he was armed. The Defendant said that he was not, and an officer told him to get up and walked him outside.

The Defendant said that, once outside, the officers were in a "semicircle" around him with their guns pointed at him. The Defendant described the next events as follows:

> The female detective was questioning me. She kept yelling at me with her gun pointed at me, yes, she did. Did you rape her, did you rape her, did you rape her. I kept shaking my head no. No. No. I ain't raped nobody. No. No. No. Yes, you did. Yes, you did. No. No. No. I ain't rape nobody, no.

6

No. No. No. Just shake my head like that right there. I ain't going to lie, I was scared pissless, I ain't going to lie to you.

Then turned around, they brought [Ms. Johnson] out, took her around to the back of the house. One officer had a shotgun in his hands, he pushed her to the ground. I looked over at [Ms. Johnson] because I could see where they pushed her on the ground. I said oh, crap. I said, please don't kill her. Don't hurt her. Like that right there. I knew I was. Yeah, I was done. I thought I was going to die. I ain't even going to lie to you.

The Defendant testified the "female" detective again asked him if he had raped the victim, and the Defendant recalled he said "yes" and again asked them not to kill his girlfriend. He said he told the officer, "I . . . did whatever you said I did, please don't kill her." The Defendant conceded that the officers never touched him, but he said that they did not have to because they had their guns pointed at his head. The Defendant said that the female officer read him his rights after she "got him to admit to raping the woman."

The Defendant said officers retrieved clothing from inside for him and then transported him to the police station. He agreed that they read him his *Miranda* rights at the time he gave a video-recorded statement. He said that, while he appeared calm in the video, he was scared. The Defendant said he did not tell the officers interviewing him about what had happened at Clearwater Court because he did not think that they would believe him.

The Defendant said that officers allowed him to make several telephone calls. He called his grandmother and mother to tell them he had been arrested. He called Ms. Johnson, and he called his other girlfriend at the time, Melinda, to explain to her what was happening. The Defendant said the following then occurred:

Then when I hung up the phone, a white male detective came up in there and I had my legs kicked out, kicked me out of the chair, kicked my feet and I fell out of the chair and kicked me a couple of times and told me to get my the [sic] black A up. Then he turned around and I jumped up, because I was shackled to [the] chair. Man, don't you put your doggone feet on me. He called for help and they brought a nightstick, which he hit me one time in my sternum area with and then he put me on the ground, put his knee on my back. He uncuffed me from the chair and cuffed me behind my back. Then he brought me downstairs with the nightstick still in his hands in front of the camera with the camera crews, the reporters from the newspaper, whatsoever.

During cross-examination, the Defendant agreed that he was "assaulted" by the white

7

male detective after he gave a statement to Detective Gooch. The Defendant agreed that Detective Gooch never threatened him or pulled a gun on him, and she left him alone to make some telephone calls. Further, she reviewed his *Miranda* rights with him. The Defendant agreed he voluntarily spoke with Detective Gooch but said he only did so because he had previously been forced to admit to committing this crime, so he did not see the harm in speaking with the detective.

The Defendant said that he was not under the influence of drugs or alcohol when the officers arrived at Ms. Johnson's house March 16. He said that he was on probation for a misdemeanor at the time. The Defendant agreed that he did not have any visible marks on him on the recording of his interview. The Defendant also agreed that he never mentioned during the interview that his girlfriend had been threatened or that police officers had held him at gunpoint. The Defendant agreed that he never filed a complaint against any police officer for his or her actions.

The Defendant identified his own handwritten statement admitting to the kidnapping and rape of the victim. He said that he was alone in the room when he wrote the statement. Further, he said no one told him what to say.

Detective Kim Gooch[2] testified by deposition that she received a call about the crimes in this case. She responded to the police station, where she interviewed the victim and then the Defendant. Detective Gooch said that she reviewed with the Defendant his *Miranda* rights, and she had him sign a form indicating as much. The Defendant signed the form indicating he was waiving those rights, and he expressed his willingness to speak with her. The detective said that the Defendant did not appear to have any signs of injury or distress, and he did not make any complaints to her about how he had been treated. She said she allowed the Defendant to make phone calls while he was in the interview room.

Detective Gooch testified that the victim was examined at the hospital while the detective waited outside the hospital room. Detective Gooch testified that she obtained samples from the examination, and she followed standard procedure to let them dry properly. She then turned the samples into the Tennessee Bureau of Investigation ("TBI") crime laboratory. The detective identified a report created by the TBI.

The detective said that, after interviewing both the victim and the Defendant, she created a photographic lineup, which she showed to the victim. The victim identified a

---

[2]Between the time of the Defendant's arrest in 1995 and the 2012 hearing, Detective Kim Gooch was married and changed her name to Kim Brooks. For the sake of clarity, and in accordance with the record, we will refer to her herein as Detective Gooch.

photograph of the Defendant as the man who had kidnapped and raped her.

Detective Gooch testified that the victim told her that the Defendant had approached her at the Hermitage Fitness Center with a weapon, forced her into the passenger seat of her car, and then drove to another location. At that location while the two were in or near the car, he raped her orally, anally, and vaginally, and then he put her in the trunk of her car. The Defendant, she said, transported her to another location, a building in the Rivergate area, and he took her out of the trunk and then raped her again. During the course of her investigation the detective obtained a tape recording from a security camera at Hermitage Fitness Center. She also obtained another tape from a security camera located behind a social security building.

During cross-examination, Detective Gooch testified that after she interviewed the Defendant, she issued a report closing the case. She said this action comported with her department policy. Detective Gooch said that she did not accompany other officers to the location where the Defendant was apprehended. She said she did not interview any of the witnesses who were present when the Defendant was apprehended.

The trial court entered an order denying the Defendant's motion to suppress his statements. The trial court found:

> The [D]efendant contends that his statements were made as the result of coercion and threats and therefore should be suppressed.
>
>     . . . .
>
> In the instant motion, the Court has observed the testimony of the witnesses and reviewed the [D]efendant's statements. The Court does not find the [D]efendant to be a credible witness and accredits the testimony of the three officers. The [D]efendant's allegations are not consistent with his recorded statements, and he has not presented any credible proof to support the contention that his statements were the result of coercion or threats of force. On several occasions during his Rutherford County statement, the [D]efendant expressed concern about his girlfriend not finding out about the charge he was facing. At no time did the [D]efendant mention any conduct by law enforcement against his girlfriend. The detectives were polite during the statement and there were no overtones of force or coercion. The Court accredits the testimony of the officers that they informed the [D]efendant of his Miranda rights before he made any incriminating statements when he was initially arrested, and that they did not threaten him. The Court finds that the

9

[D]efendant made an intelligent, knowing, and voluntary waiver of his Miranda rights that was not given as a result of threats of force or coercion.

(footnotes omitted).

## 2. Motion to Dismiss

On April 23, 2012, the Defendant filed a motion to dismiss based upon the unavailable rape kit evidence. In the motion the Defendant argued that, at the time of his arrest on March 16, 1995, police officers collected a variety of evidence, including clothing and a "rape kit" from the victim. The Defendant acknowledged that he pled guilty to these charges on November 16, 1995. The rape kit was held in the property room of the Metropolitan Nashville Police Department for several years, and was destroyed February 15, 2000.[3] The Defendant asserted that the State had a duty to preserve this evidence and that, while it was unclear whether this DNA evidence would be exculpatory, it was material to his defense. He asserts that there was "an obvious potential" that the evidence would have been exculpatory. The Defendant asked the trial court to dismiss the indictment.

In a supplemental motion, filed July 3, 2012, the Defendant argued that the State should have been on notice that the Defendant was claiming his innocence based upon "his frequent and voluminous filings" after he pled guilty. Counsel for the Defendant conceded in the motion that there was no indication that the State had hid the existence of the rape kit because it contained semen.

Wilford Klotzback, a sergeant assigned to the evidence storage section, testified that his records indicated that the rape kit in this case came into the evidence storage section on May 11, 1995. On January 10, 2000, Sergeant Phil Sage moved the rape kit from its permanent storage location to a temporary location of DEST, which is a location code that is used for items of evidence that have been identified for possible destruction. Sergeant Klotzback explained the process for destruction of evidence, saying that evidence is first moved to the DEST location until the District Attorney and the trial court approve of its destruction. The District Attorney first reviews the cases after which they return to the police department a list of cases that have been "cleared" for destruction. Sergeant Klotzback's office confirmed that this was the same procedure used at the time of the motion hearing, but he was unaware whether this procedure was used in 2000, before he was assigned to the unit. The sergeant identified an order of approval signed by Judge Wyatt on February 25, 2000,

---

[3]The Defendant asserts that it is unclear from the destruction sheets whether the evidence was destroyed February 15, 2000, or February 15, 2008. Based on the testimony at the motion hearing and the trial court's subsequent findings, we will use the date February 15, 2000.

which indicated that the rape kit could be destroyed. He drew up a court order and had it signed by Judge Wyatt. His records indicated that the rape kit was marked destroyed on February 15, 2000, but he had no document showing when the items were actually destroyed

During cross-examination, Sergeant Klotzback conceded that the records appeared to indicate that the evidence was destroyed before the trial court signed the order approving its destruction. The sergeant agreed that a rape kit is a small item that did not take up much space in the property room.

Phillip Sage, a retired sergeant with the Metropolitan Police Department, testified that he was the supervisor in the property room when the rape kit was destroyed. He said that it was the policy of the property room to assign a complaint number to the evidence that correlated with the case. The property room officers would check and verify that the case had been adjudicated in court and that there were no appeals pending, which would cause them to retain possession of the evidence.

Sergeant Sage testified that this case had gone through the court system and appeared to be "completely over with." The property room officers, therefore, added it to a list of other cases to be destroyed. The list was submitted to the trial court for the authority to destroy the property. Sergeant Sage testified that Judge Wyatt approved the destruction, and the property was destroyed after his office received the judge's order.

Sergeant Sage identified the discrepancy in the dates of the destruction of the evidence and the judge's order. He said he could "speculate" about what had happened, but he did not know for sure. He maintained, however, that he never destroyed any property unless he had an order from the court. He stated that he was the person who sought the court order, and he would not have destroyed the property until that order was received.

During cross-examination, Sergeant Sage testified that the discrepancy in dates could have been a typographical error.

On August 2, 2012, the trial court issued an order denying the Defendant's motion to dismiss based on findings discussed below.

### 3. DNA Evidence

On April 17, 2012, the Defendant filed a motion in limine, which he supplemented on August 17, 2012, requesting that the trial court rule on whether he could present evidence that DNA evidence was unavailable and whether the State could present evidence that he had previously pled guilty. The Defendant contended that the State had recovered a biological

11

specimen during the victim's medical examination and that this evidence was never tested. He acknowledged the State's argument that it did not test the specimen because he pled guilty, but he countered that the State had eight months to test the sample between when it was gathered and before he pled guilty.

At a hearing on the issue, the Defendant informed the trial court that the evidence he was seeking was destroyed after the Defendant pled guilty, and the case appeared resolved. He said he wanted to be able to inform the jury that the evidence was destroyed but not have the jury know the reason for its destruction. The trial court expressed concern that allowing the Defendant to make an issue of the biological evidence not being tested would be misleading if the jury were not also informed that the reason it was not tested was because the Defendant pled guilty.

The trial court found:

In terms of the Court's ruling on this matter and I thought, there could be hundreds of examples, an example maybe a shooting, a murder, and the bullets collected from the murder victim and the gun could be matched or a gun could be matched to that bullet and if the gun were put into the defendant's hand, then that would be circumstantial proof that he was the shooter.

Well, if that [D]efendant fleeing the scene went across this bridge right here and threw the gun over in the river, then I don't think it's appropriate to question, bring up, why wasn't the gun matched? Or you can't prove your case because the gun was never put in any client's hands, or the gun with the bullet was never matched to the gun. Well, the gun isn't there because the defendant threw it over in the river.

If you made that argument and then prevented the State from asking the defendant what happened to the gun, I threw it in the river, then that would be crazy. It would be extremely misleading and unfair, unfairly prejudicial to the State. And I think, you know, the defense attorneys are advocating for their client but also realized, and not necessarily acknowledged here at this motion hearing here, but understand that that obviously would then put the Court in a predicament in terms of ruling on: Can the State then explain why they didn't go further? And I have no clue. Maybe they've got ten reasons to explain that. Maybe from some of the [D]efendant's prior testimony that he ple[d] guilty because he thought someone was going to kill him if he didn't, I don't know. But it appears at this hearing that they are not wanting that option. They are

12

not wanting the Court to rule on, well, if we can ask that, then we are okay with the State following up as to why because we've got some great explanations about why he ple[d] guilty. In and of itself, the guilty plea – obviously, the State just couldn't introduce in and of itself in their case in chief because that is unfairly prejudicial it's not relevant to anything at this point, but it could become extremely relevant if this issue were raised by the defense.

So one, I don't think it's relevant under 401. It may have been probative if it had been tested, but it's not tested because of the guilty plea. And so – but if even if it passed 401 we get to 403 and I understand the weighing process there and substantially the probative value would have to be substantially outweigh[ed] by the unfair prejudice, but there is that confusion, misleading area if this issue is brought up, and it would be unfairly prejudicial. Usually that rule – you know, we deal with issues that are unfairly prejudicial to the defendant, but it applies to the State as well, but more so of misleading the jury. The jury is like oh, well, the State – we heard from five witnesses that they didn't do any further testing, and like I said that's, you know, going to be an out there anyway, it's a given that it wasn't.

But to be able to compound that further by – and I'm not in any way preventing the defendant from arguing there is a lack of proof, . . . but to specifically say or the elements haven't been shown in terms of the allegation, but to specifically allow the questioning concerning the lack of DNA testing when we all know that – why there was not DNA testing would be extremely misleading and confusing to the jury.

So that issue, in the Court's opinion, just isn't an issue because there was no testing.

### 4. Trial

The case then proceeded to trial during which the parties presented the following evidence: The victim, K.D.,[4] testified that in March 1995 she was living in Davidson County, was thirty-three, and was married. The victim described herself as "overweight" at the time and had been diagnosed as diabetic. She was going to a gym, The Hermitage Fitness Center, for water aerobics in an attempt to lose weight. The victim said she also suffered from asthma and took medication to treat her asthma.

---

[4]In keeping with the policy of this Court, we will refer to the victim by her initials to protect her privacy.

13

The victim recalled that her aerobics class was scheduled to begin at 7:00 p.m. She arrived at the gym alone, driving her mother-in-law's white four-door vehicle. When she arrived at the gym, the victim was wearing a swimsuit under a T-shirt and some sweat pants. Her class did not start on time, and she got out of the class at around 7:30 or 7:40 pm. She exited the gym carrying her gym bag and wearing only her T-shirt and pants. She did not have on under clothing because she came to the gym in her bathing suit.

The victim described the events that occurred after she exited the gym:

I came out of the fitness center and I walked to my vehicle. I had my keys in my hand. I . . . unlocked the car and got in. Before I could get the door completely shut, it was pulled back open and I had a gun put in my face and was told to scoot over.

. . . .

I got so nervous I dropped the keys. And, of course, I had a g[u]n[] in my face so I complied. And then he told me to hand him the keys and I looked in my hand and I'm like, yeah, I don't know where they're at. And he is just like, yes, you do, because you just unlocked the car. That's the reason why I'm taking this car is because you had the keys in your hand.

The victim said she found the keys on the floorboard of the car, and she slid over to the passenger side of the car. The Defendant entered the vehicle, started the car, and drove out onto the road. He told the victim he was going to let her go in a little bit, and he made her put on her seat belt. The Defendant told the victim that he would kill her if she tried to get away, and he mentioned that his gun had a "hair trigger." The Defendant grabbed the victim's breast, which startled her. The Defendant said "oh, don't worry, I'm not going to rape you, or anything, I just like big breasts." The Defendant noted that there was a handicap placard hanging from the rearview window. He asked her what the placard was for, and the victim told him that she had bad knees and could not walk very well.

The victim said the Defendant drove toward the Hermitage and parked near the main gates, which were closed. The Defendant unzipped his pants and pulled them down. He placed the gun to the victim's head and pulled her head down toward his crotch area. He then penetrated her mouth with his penis. The Defendant told the victim to get out of the car and take her pants off. She said he bent her over the hood of the car and he attempted to perform anal sex upon her. The victim said she clamped down the muscles of her rectum so that the Defendant would be unable to penetrate her. The victim said that the Defendant spit on her back and used his saliva for lubrication. He repeatedly attempted anal sex but was

14

unable to penetrate her successfully. The victim said she repeatedly told the Defendant that it hurt and asked him to stop.

The victim said that the Defendant then forced her into the backseat of the car, where she laid face down. The Defendant then vaginally penetrated her from behind. The victim said that the car doors were open during these events, and the car light was illuminated providing her with a good view of the Defendant during the attack. She was, therefore, able to see the Defendant during the attack.

The victim said that the Defendant opened the trunk of the car and removed a wheelchair that belonged to her mother-in-law. He then forced her into the trunk and slammed the lid of the trunk shut. The Defendant then told her that he was going to let her go after a while and to be quiet. The victim said that, from the trunk, she could hear the Defendant listening to rap music at a loud volume. She also heard the Defendant making telephone calls. The victim said that, at one point, the Defendant stopped the vehicle and told her he was going to let her go in a few minutes. When the Defendant opened the trunk, the trunk light illuminated, and the victim could again see his face.

The victim said the Defendant stopped a short time later and once again opened the trunk. He told her to get out and to get undressed. The victim noted that they were behind a brick building. The Defendant, who still had the gun, told the victim to give him oral sex. He penetrated her mouth. She said she told him that she did not like that, and he put her on the back seat of the car and vaginally raped her again. At one point, the Defendant's penis fell out of her. He made the victim put it back inside her, and he told her that if it fell out again he was going to anally rape her.

The victim testified that, during one the rapes, she had an asthma attack. The Defendant asked her if she had asthma, and, when she responded affirmatively, he acted concerned. He, however, placed her back inside the trunk of the car after raping her. The victim said she was in the trunk for "[a] long time." The Defendant then cracked the lid of the trunk and asked the victim how to open the gas door. He told the victim that if she screamed, he would kill her. She told him how to open the gas door, and he pushed the trunk closed again.

The victim said that, at some point thereafter, the Defendant backed into something. He stopped the car and asked if the victim was okay. He apologized, telling her he had backed into a pole. The victim said the Defendant drove around for some length of time. She heard him tell someone on the telephone that he wanted to get some sleep. She then heard what she thought was him getting out of the car because she heard the car door open and shut and heard a dog barking like "it wanted to get off its chain and kill someone." She

15

then heard what sounded like a metal screen door to a house open and shut, and the dog stopped barking.

The victim said she started feeling around the trunk, and she found a toolkit that her mother-in-law kept in the trunk. She said that she opened it and found a "nut driver." She used it to "pop[]" open the trunk. She cracked it slightly and saw that there were trees on one side. It appeared that there was a house or a trailer that had lights and a picture window facing the car. The victim said she was concerned about exiting the trunk for fear that the dog she had earlier heard might attack her before she could reach the nearest house. Her concern was heightened by the fact that she had difficulty walking because of her knees. For these reasons, she closed the trunk.

The victim testified it was "quite some time" before the Defendant came out of the house, but she did not think it was long enough for him to get a full night's sleep. She heard the Defendant get into the car and start it again. She heard the stereo "blaring," and could feel the car moving again. The Defendant, she said, drove for quite some time. The victim said that she was aware that the sun had risen because she could see sunlight filtering into the trunk from the taillights. The Defendant asked the victim if she had to go to the bathroom, and the victim responded, "[Y]es, very badly." He also handed her a bag from McDonald's that contained two Egg McMuffins. He then shut the trunk again. The victim said that, because of her diabetes, she ate a few bites of the Egg McMuffin in an effort to maintain her blood sugar level.

The victim recalled that the Defendant stopped the car behind a strip mall. He let the victim out to use the bathroom, and she asked him if she could have her towel from her gym bag. The Defendant acquiesced, warning her not to run or scream or he would kill her. The victim relieved herself by a lamppost. The victim said she placed the towel she used in the backseat. The victim said that a commercial truck drove by after she had urinated, and the Defendant put his arm around her waist. The victim said that it was "broad" daylight at this point.

At this point, the victim told the Defendant that her husband was away from home driving a truck and that her niece was watching the victim's children. She said that her niece would be "frantic" by now. The Defendant told the victim to call her niece and come up with a plausible explanation about why she had not returned from the gym. The victim said she called her niece, Janthra, but she did not answer. She left a message on the answering machine telling her that she had seen a friend, Joanna, and the two got intoxicated. The victim said on the message that she had slept at her friend's house. She told Janthra that she should be home by the time the children returned from school, at which point the Defendant, who was standing next to her, shook his head "no." She asked Janthra to get the children

16

something to eat. The victim explained that this message was actually a cryptic message to her husband. She said that she did not, in fact, have any children, that she called her niece Joy and not Janthra, that her friend Joanna had died recently, and that she did not drink. She assumed that when her husband got the message he would know that something was wrong and call the police.

After the victim left the message, the Defendant again put her in the trunk. He drove, and the trunk became stifling. She heard the car door slam and also a house door open and close. The victim said she waited a short period of time and then "[p]opped" the trunk again. She only cracked it to see out. She was able to see another house, so she knew it was a fairly well-populated area. The victim got out of the trunk, and closed the trunk, making sure it did not slam or make any noise. The victim said that, because she was unsure which house the Defendant had entered, she walked between a couple of houses to another road. She saw a couple working in their garden, and she called to them and asked the woman if she could call the police. The woman agreed and invited the victim to come into their home.

The victim recounted that the police arrived quickly, and she gave them a description of the Defendant. The victim said that police transported her from the couple's house to the police station where she spoke with officers and gave a statement. She helped police officers find some of the locations where the attacks had occurred, and she went to the hospital for a medical examination. The victim said she also identified the Defendant from a photographic lineup created by the police.

The victim identified a picture of the gun that the Defendant pointed at her, and she said that she believed that it was a real weapon at the time. The victim also identified photographs of the McDonald's bag in the trunk of the car, the towel she used when she urinated that was located in the backseat of the car, and her purse in the driver's seat. The victim identified a photograph of a white stain on the front seat of the car, and she said that the stain was a result of the sexual assaults.

During cross-examination, the victim testified that a police officer informed her that the Defendant was in custody and that some of her belongings were recovered from the house where he had been arrested. She said that she described the Defendant to police as between five feet five inches and five feet eight inches tall. The victim agreed that she was mistaken and that the first assault occurred in the front seat and not the back seat of the car. The victim agreed that she saw the Defendant when he was being arrested by police at the Clearwater Court house. She further agreed that this was before she was shown the pictures for the photographic lineup. She said, however, that this did not influence her recollection of the Defendant's appearance.

17

During redirect examination, the victim said that because she had multiple opportunities to view the Defendant during daylight hours, she was confident in her identification of him.

Detective Charles Thomas with the Rutherford County Sheriff's Office testified that at 10:00 a.m. on March 16, 1995, he responded to a 911 call for help. He said that 911 had received a call from a woman at 610 Sedridge Drive, who said that the victim had come to her home asking for help, saying that she had been kidnapped and had gotten out of a car located at 7822 Clearwater Court.

Detective Thomas testified that he first responded to 610 Sedridge Drive. Once there, the victim told him that her car was located at 7822 Clearwater Court. The detective proceeded to 7822 Clearwater Court, where he saw the car that the victim had described and noted that the trunk of the car was ajar. Detective Thomas knocked on the door several times, and a woman named Tonya Johnston came to the door. Ms. Johnston told the detective that she lived at the residence with her mother. The detective asked her whose car was parked in the driveway, and Ms. Johnston responded that it belonged to her cousin's friend.

Detective Thomas testified that Ms. Johnston opened the door and turned and walked into the house, and he and another detective followed her. As she was walking, Ms. Johnston was talking to an individual in the bedroom, who the detective later identified as the Defendant. The Defendant was lying on a bed in the bedroom, and Detective Thomas asked him to get up. The other detective took the Defendant outside, and Detective Thomas briefly looked around for weapons in the house. The detective then asked Ms. Johnson what she knew about this situation.

Detective Thomas said he went outside and administered to the Defendant his *Miranda* warnings. The Defendant then told him that he needed a ride from Nashville, so he kidnapped a lady, put her in the trunk of her car, and drove to this house. Another detective, Detective Acton, was also present and asked the Defendant if he raped the woman. The Defendant responded that he did rape her. He said he was eventually going to let the woman go. Detective Thomas testified that both the victim and the Defendant were separately transported to the police station.

During cross-examination, Detective Thomas testified that he knew the serious nature of this case at the time he responded. He said that he responded with several officers, but he did not recall whether their weapons were drawn at the time they knocked on the door and entered the home. The detective said that it would have been police procedure to have their weapons drawn, but he did not think he had his drawn. Thus, he did not follow police

procedure.

Detective Thomas agreed that, when he found the Defendant in the bedroom, the Defendant did not try to escape or resist the officer. The detective agreed that he did not have the Defendant sign a *Miranda* waiver form. He said he did not recall the Defendant's specific words when the Defendant admitted to raping the victim, but he maintained that the Defendant had admitted to raping the victim.

Charles Ray Blackwood, Jr., testified that he was a crime scene investigator for the Metropolitan Nashville Police Department at the time that the crimes in this case allegedly occurred. He said that he processed the victim's vehicle. Investigator Blackwood photographed the vehicle, he took fingerprints from the vehicle, and he collected other evidence found inside the vehicle. The investigator identified photographs associated with his work on the victim's car. Investigator Blackwood inventoried the items that he gathered from the vehicle as evidence, including:

> [V]acuumings; hair from the end of the barrel of the gun; one Crossman BB, a Peter Marksmen pistol from the driver's floorboard; towel, front right rear seat floorboard; right front seat cover, that section that was stained; lower section of the seat, seat cover from the driver's lower section of the front seat, part you sit in the driver's seat, . . . two tape lifts.

He also gathered evidence from inside the trunk of the car. One of those items was a "nut driver." He had learned that the victim said she used a nut driver to get out of the trunk. Investigator Blackwood said that he tested the nut driver on the trunk and found that he could release the trunk lock and open the trunk with the nut driver.

Officer Blackwood testified that he lifted several prints from both the inside and the outside of the victim's vehicle. The officer drew a sketch memorializing each location where he lifted a print. Officer Blackwood took prints from the gun located in the vehicle. He also lifted a print of the serial number of the gun.

During cross-examination, Officer Blackwood testified that he created thirteen fingerprint cards from prints that he lifted from the vehicle, some of them from the inside of the trunk.

Amanda Preble Acton,[5] a commander with the Rutherford County Sheriff Department,

---

[5]Commander Acton was married during the time between the Defendant's arrest and his trial. Her married name was Morton. For consistency, we will refer to her by "Acton," her name at the time of

testified that at the time of the Defendant's arrest she held the rank of detective and she was assigned to investigate general criminal activity. Commander Acton testified that she responded to the call in this case and first went to the home where the victim was located. There at the time were also Sergeant Thomas, Detective Gross, and Detective Warf. The officers were told that the victim's car was located nearby on Clearwater Court.

Commander Acton testified that, when she arrived at the Clearwater Court address, she saw the vehicle in "park" with the trunk unlatched. Looking inside the vehicle, the commander saw what appeared to be an automatic handgun. Commander Acton said other officers went to the door to inquire about the Defendant's whereabouts, and they returned with the Defendant. The commander was present when the Defendant was read his *Miranda* rights and when thereafter the Defendant made statements to police. At one point, Commander Acton asked the Defendant specifically if he had raped the victim, and the Defendant said, "[Y]eah" and informed her that the attack had all happened in the Nashville area.

Commander Acton testified that officers transported the Defendant to the police department for formal interviews. The Defendant was again given his *Miranda* warnings, and he signed a waiver of those rights. The commander was present for portions of the Defendant's video recorded interview, and she assisted in obtaining his recorded statement and a handwritten statement and transporting them. Commander Acton read the Defendant's handwritten statement as follows:

> I pick up the lady at the . . . fitting center; calm her down. Drove off to the Hermitage; had sex. Put her in the trunk. Drove to pick up some money. She was in the trunk for about five hours, I think. Went to my girlfriend. Got picked up. She made me nervous so I put her in the trunk.

The State then offered, and the trial court admitted, the video recorded statement and an accompanying transcript.

Kimberly Gooch, who was a detective with the Metropolitan Nashville Police Department at the time of the Defendant's arrest, testified that she was assigned to the adult sexual crimes unit at that time. She said that the Rutherford County Sheriff's Department gave her a copy of the Defendant's recorded interview and handwritten statement. Detective Gooch interviewed the victim, who she described as cooperative. She then interviewed the Defendant. Detective Gooch learned in the interview that the Defendant had completed the eleventh grade in school and that he was employed at Taco Bell.

---

these events.

Detective Gooch said that, during the interview, the Defendant admitted that he was walking down the road when he saw the victim and approached her car. He said that he walked up to her with a BB gun that belonged to his uncle. The BB gun, he said, looked like a real .45 gun. The Defendant said he forced the victim into the passenger side of the vehicle. He drove her to the Hermitage, where he forced her to perform oral sex. He also had vaginal sex with her at this location. The Defendant told the detective that the victim was making him nervous, so he opened the trunk, took out a wheelchair, and put the victim into the trunk of the car. The Defendant went on to state that he pulled behind the Social Security building and again had the victim perform oral sex upon him, and then he again vaginally raped her. The Defendant said that he attempted anal sex at some point during the evening. The State played an audio recording of the interview, which confirmed the detective's account of the interview.

Detective Gooch testified that, as part of her investigation, she transported the victim to the hospital for a "medical/legal" exam. During such examinations, doctors ask victims of sexual assault about the events that occurred, gather evidence, and look for signs of trauma. Detective Gooch gathered the evidence obtained by the nurse during the examination. Detective Gooch said that, a few days later, she showed the victim a photographic lineup containing the Defendant's photograph. The victim identified the Defendant's photograph as the man who had kidnapped and raped her.

During cross-examination, the detective testified that she went to the Hermitage to document it and take photographs. She did not find the wheelchair that the Defendant said he had removed from the car. She agreed that she did not speak with anyone who worked at the Hermitage, the Social Security office, or the fitness center.

During redirect examination, Detective Gooch said that, during her interview with the Defendant, she did not see any injuries on him and he did not appear to be in distress. The detective said that she allowed the Defendant to use the telephone because he was being cooperative and had accepted responsibility for what he had done.

Marilee Weingartner, a family nurse practitioner, testified that she performed "medical legal examinations" on rape victims. She performed the examination of the victim in this case and wrote a report documenting the examination. Ms. Weingartner read the portion of her report that contained the victim's statement of what had happened, and it substantially comported with the victim's trial testimony. Ms. Weingartner described the victim's demeanor in her report, stating that the victim appeared glad to be alive, angry, and tired. The crotch of the victim's pants was ripped and her hair was unbrushed.

Ms. Weingartner testified about the victim's physical examination. She said that there

was semen on the area outside of her vulva and also specs of brown debris. The nurse found blue lint in the victim's pubic hair. Ms. Weingartner gathered a sample of vaginal fluid, and she saw sperm. She gave Detective Gooch the evidence that she had gathered during the examination.

Margaret Bash, an agent with the TBI crime laboratory, testified that she received the evidence contained in the medical legal kit in this case. She discovered spermatozoa and semen in the victim's vaginal fluid that indicated that the intercourse had occurred within twenty-four to thirty-six hours before the sample was taken. She did not find semen or spermatozoa from the sample taken from the victim's mouth, but she said this was not surprising considering that everyone produces saliva "pretty much" continuously.

Jacqueline Cockrill, a civilian working in police identification with the Metropolitan Nashville Police Department, testified that she examined the fingerprints submitted in this case. She found prints matching the Defendant's prints on: the steering wheel crank knob; the edge of the driver's door; the left rear door outside; the trunk; the trunk lid; and the BB gun.

During cross-examination, Ms. Cockrill agreed that there were multiple prints from the inside of the trunk that did not match the victim's or the Defendant's prints. Additionally, there were several other prints from other locations in the vehicle submitted that did not match either the victim or the Defendant.

Based upon this evidence, the jury convicted the Defendant of especially aggravated kidnapping, aggravated robbery, four counts of aggravated rape, and attempted aggravated rape.

### 5. Sentencing

At the sentencing hearing, the State offered the presentence report and certified copies of the Defendant's convictions. Those convictions showed that the Defendant had previously been convicted of theft and failure to stop at the scene of an accident. The Defendant was serving a sentence of probation at the time he committed the offenses herein.

The victim testified about how the Defendant's actions had impacted her life. She said that she suffered from post-traumatic stress disorder. She said that, before these attacks, she and her husband had a "very loving marriage." After the rape, he "never touched [her] again," and the two "wound up divorced." The victim said that she had since moved away from Tennessee.

The victim testified that she had also become claustrophobic and, for years, she could not listen to music at all. She said she still could not listen to "rap" music. She said that she suffered from extreme stress from these rapes, and she attributed her six heart attacks to the stress. The victim expressed to the trial court her belief that the Defendant was a danger and was without a conscience.

On behalf of the Defendant, Glenda Davis, the Defendant's mother testified that the Defendant had just turned eighteen when he was arrested in this case. Ms. Davis said that the Defendant's grandparents raised him, with her assistance. She described the Defendant as a "good kid." She asked the judge for leniency, saying that everyone deserves a second chance in life.

During cross-examination, Ms. Davis agreed that this incident occurred on March 15, and that the Defendant's birthday was April 13. He was, therefore, almost nineteen when it occurred. She said she did not recall him being on probation for theft at the time of this incident. Ms. Davis said that the Defendant had never expressed remorse to her for these crimes, but she said the two had never discussed this situation.

Based upon this evidence, the trial court sentenced the Defendant to twenty years for Counts 1, 2, 3, 6 & 7. The trial court sentenced the Defendant to ten years for Counts 2 and 5. The trial court found that the Defendant qualified as a "dangerous offender," and it ordered partial consecutive sentencing, for a total effective sentence of seventy years. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to suppress his statements to police; (2) the trial court erred when it denied his motion to dismiss based upon the State's destruction of evidence; (3) the trial court erred when it ruled on a DNA issue; (4) the evidence is insufficient to sustain his conviction for two counts of aggravated rape because the State did not prove that he was armed with a weapon or anything the victim reasonable believed was a weapon; (5) the trial court erred when it allowed separate convictions for aggravated rape in Counts 3 and 4 and attempted aggravated rape in Count 5 because separate convictions violate his protections against double jeopardy; (6) the trial court erred when it ordered his sentences to run consecutively and when it ordered him to serve his sentence for especially aggravated kidnapping at 100 percent.

### 1. Motion to Suppress

The Defendant contends that the trial court erred when it denied his motion to

suppress his statements to police: (1) an oral statement made to Commander Acton the day of his arrest; (2) a handwritten statement written by the Defendant at the Rutherford County Sheriff's Department shortly after his arrest; (3) a videotaped statement made at the Rutherford County Sheriff's Department shortly after his arrest; and (4) a videotaped statement made by the Defendant to Metropolitan Nashville Police Department Detective Gooch after he was transported to Nashville from Rutherford County. The Defendant asserts that his four statements were involuntary and the product of coercion and threats by police at the time of his arrest. The State counters that the record "amply reflects" that the Defendant knowingly and intelligently waived his *Miranda* rights and that, thus, the trial court properly denied his motion to suppress.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment); *see State v. Jose GARCIA a/k/a Hilberto Alejandro Rentira Lerma*, 2012 WL 850698, No. M2010-01661-CCA-R3-CD, at *18 (Tenn. Crim. App., at Nashville, Mar. 13, 2012), *perm. app. denied* (Tenn. Aug. 16, 2012). Article I, Section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The significant difference between these two provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An

exception arises, however, when a government agent makes a custodial interrogation. Statements made during the course of a custodial police interrogation are inadmissible at trial unless the state establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). "Confessions that are involuntary, i.e., the product of coercion, whether it be physical or psychological, are not admissible." *State v. Phillips*, 30 S.W.3d 372, 376 (Tenn. Crim. App. 2000) (citing *Rogers v. Richmond*, 365 U.S. 534, 540 (1961)). In order to make the determination of whether a confession was voluntary, the particular circumstances of each case must be examined. *Id.* at 377 (citing Monts v. State, 218 Tenn. 31, 400 S.W.2d 722, 733 (1966)). In considering the totality of the circumstances a court should consider:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (citing *State v. Readus*, 764 S.W.2d 770, 774 (Tenn. Crim. App. 1988)). No single factor, however, is necessarily determinative. *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (citing *Fairchild v. Lockhart*, 744 F.Supp. 1429, 1453 (E.D. Ark. 1989)). Further, "[a] trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the defendant can show that the evidence preponderates against the trial court's ruling." *State v. Keen*, 926 S.W.2d 727, 741 (Tenn. 1994).

"Coercive police activity is a necessary prerequisite in order to find a confession involuntary." *Id*. (citing *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)). "The crucial question is whether the behavior of the state's officials was 'such as to overbear [defendant]'s will to resist and bring about confessions not freely self-determined.'" *Id.* (quoting *Rogers*, 365 U.S. at 544); *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980).

25

The question must be answered with "complete disregard" of whether the defendant was truthful in the statement. *Phillips*, 30 S.W.3d at 377 (citing *Rogers*, 365 U.S. at 544).

We conclude that the evidence does not preponderate against the trial court's finding that the Defendant's confessions were made after he knowingly and voluntarily waived the *Miranda* rights given to him. The evidence presented showed that police officers apprehended the Defendant while he was sleeping at the home of his girlfriend. They brought him outside, and both Detective Thomas and Commander Acton testified that Detective Thomas issued the Defendant his *Miranda* warnings. The officers then questioned him about the car parked in the driveway and about his interactions with the victim. The Defendant told them that he had kidnapped the victim because he needed a ride and that he put her in the trunk. When directly asked if he raped the victim, the Defendant said yes.

During the suppression hearing, the Defendant offered his testimony that four police officers entered the home where he was sleeping with their guns drawn. They told him to put his hands on the ground and get his "ass" on the ground. He said he was not armed and that the officers walked him outside, standing in a semicircle around him with their guns pointed at him. A female detective then pointed a gun at him and repeatedly yelled, "Did you rape her?" He said he repeatedly said, "No." The Defendant said that, at that point, the police brought his girlfriend outside, and an officer carrying a shotgun pushed her to the ground. The Defendant said he pleaded with the police not to hurt or kill his girlfriend. He then admitted to the rape, saying, "I did whatever you said I did, please don't kill her." The Defendant said it was only after this that the officers read him his *Miranda* rights.

The Defendant said he was then brought to Rutherford County Sheriff's Department where he was given his *Miranda* warnings at the beginning of a video recorded statement. The Defendant signed a waiver of those rights. The Defendant again admitted to his conduct, and he provided a detailed account of the crimes. The Defendant also gave a handwritten statement, consistent with his previous two statements. The Defendant was transferred to the Metropolitan Nashville Police Department, where he was again given his *Miranda* warnings. The Defendant signed a waiver of those rights and provided a fourth statement, consistent with the previous three accounts. The Defendant explains that he maintained his guilt because he did not think that the police would believe him because he was black and the victim and his girlfriend were both white.

The trial court stated it did not "find the [D]efendant to be a credible witness" and it "accredit[ed] the testimony of the three officers." The trial court further found that the Defendant's allegations were not consistent with his recorded statements and that he had not presented credible proof to support the contention that his statements were the result of coercion or threats. The trial court noted that the Defendant, during his Rutherford County

statement, expressed concern about his girlfriend not finding out about the charge he was facing but did not mention the alleged conduct by law enforcement officers. The trial court accredited the testimony of the officers that they informed the Defendant of his *Miranda* rights before he made any incriminating statements when he was initially arrested and that they did not threaten him. The trial court found that the Defendant made an intelligent, knowing, and voluntary waiver of his Miranda rights, and that the waiver was not the result of any coercion or threats of force.

The trial court heard the testimony of the witnesses, and it did not err when it accredited the testimony of the law enforcement officers and when it found the Defendant not to be credible. There is ample evidence in the record that the Defendant was given his *Miranda* warnings before he gave his first statement to police. The Defendant was, thereafter, given those warnings on two other occasions, and he provided police with four consistent statements admitting that he kidnapped and raped the victim. The trial court did not err when it denied his motion to suppress. The Defendant is not entitled to relief on this issue.

### 2. Motion to Dismiss

The Defendant asserts that the trial court erred when it denied his motion to dismiss his charges based upon the State's destruction of evidence. He asserts that he proved that, in 2000, the State destroyed the "rape kit" evidence taken from the victim during her medical exam. The State's destruction of this potentially exculpatory evidence, he asserts, violated his right to a fair trial. The State counters that the trial court properly denied the motion to dismiss after finding that the State was not negligent when it destroyed the evidence and that the Defendant could receive a fundamentally fair trial without the unavailable evidence.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides for every defendant the right to a fair trial. "As a general rule, . . . a trial lacks fundamental fairness where there are errors which call into question the reliability of the outcome." *State v. Ferguson*, 2 S.W.3d 912, 914 n.3 (Tenn. 1999) (citing *Betts v. Brady*, 316 U.S. 455 (1942); *Watkins v. State*, 393 S.W.2d 141, 144 (Tenn. 1965); *Lofton v. State*, 898 S.W.2d 246, 248 (Tenn. Crim. App. 1994)). To facilitate the right to a fair trial, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. *United States v. Agurs*, 427 U.S. 97, 110-11 (1976). In the landmark case of *Brady v. Maryland*, the United States Supreme Court held that the prosecution has a constitutional duty to voluntarily furnish the accused with any exculpatory

27

evidence that pertains to (a) the guilt or innocence of the accused and/or (b) the punishment which may be imposed if the accused is convicted of a criminal offense. *Brady*, 373 U.S. at 83.

The State has a general duty to preserve all evidence subject to discovery and inspection as part of Tennessee Rule of Criminal Procedure 16. *State v. Ferguson* governs claims regarding the State's duty to preserve potentially exculpatory evidence. 2 S.W.3d 912, 917 (Tenn. 1999); *see also State v. Merriman*, 410 S.W.3d 779, 785 (Tenn. 2013). *Ferguson* requires a trial court to determine "[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair." *Ferguson*, 2 S.W.3d at 914. When this claim is raised by a defendant, *Ferguson* first requires the trial court to determine whether the State had a duty to preserve the evidence. In the Tennessee Supreme Court's recent case, *Merriman*, it stated:

> In *Ferguson*, we acknowledged the State's general duty to preserve all evidence subject to discovery and inspection under Rule 16 of the Tennessee Rules of Criminal Procedure and other applicable law, including *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). *Ferguson*, 2 S.W.3d at 917. We recognized, however, the difficulty in defining the boundaries of the State's duty to preserve evidence when its true nature, whether exculpatory, inculpatory, or neutral, can never be determined. *Ferguson*, 2 S.W.3d at 915, 917.

> Although difficult to define, the State's duty to preserve evidence is limited to constitutionally material evidence described as "evidence that might be expected to play a significant role in the suspect's defense." *Ferguson*, 2 S.W.3d at 917 (quoting *California v. Trombetta*, 467 U.S. 479, 488, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)). To meet this materiality standard, we held that the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *Ferguson*, 2 S.W.3d at 915, 918. If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty. *Ferguson*, 2 S.W.3d at 917.

*Merriman*, 410 S.W.3d 785 (footnote omitted).

The *Merriman* Court explained that if the proof demonstrates the existence of a duty to preserve the evidence and demonstrates that the State failed in that duty, "the analysis moves to considerations of several factors which guide the decision regarding the consequences of the breach." *Id*. Those factors include: "(1) The degree of negligence

28

involved; (2) The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) The sufficiency of the other evidence used at trial to support the conviction." *Id*. at 785 (citing *Ferguson*, 2 S.W.3d at 917). "If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges." *Id.* If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction. *Id.*

When the trial court in this case denied the Defendant's motion to dismiss, it found:

The [D]efendant asserts the Court should dismiss the indictment because the biological evidence collected from the alleged victim in the form of a "rape kit" was destroyed as a part of police procedure. The [D]efendant also supplemented the motion to assert the state's destruction of evidence violated his right to have exculpatory evidence produced.

The first step for the court is to determine whether there was a duty to preserve the evidence. . . . In this case, the Court finds the State's duty to preserve the evidence collected in the investigation in this case was not binding for perpetuity. There is no assertion that this evidence was not available to the [D]efendant prior to the entry of his guilty plea. At the time of the destruction of the evidence, the [D]efendant had already admitted his guilt by entering a guilty plea to the charges and his post-conviction petition had been affirmed on appeal and permission to appeal to the Tennessee State Supreme Court was denied. The [D]efendant entered his guilty plea in 1995 and the evidence was destroyed following a court order in 2000. The [D]efendant was not working in preparation of his defense at that time. Unlike cases in which the trial courts have dismissed the case based upon the State's failure to comply with discovery requirements pursuant to Rule 16, in this case, the State's alleged breach of duty in preserving evidence did not arise until five years after the [D]efendant had entered a guilty plea in this case. *See State v. Angela M. Merriman*, No. M2011-01682-CCA-R3-CD (Tenn. Crim. App. Feb. 17, 2012).

Notwithstanding the finding, the Court further finds that even if there had been a duty to preserve, under the balancing test provided [in] *State v.*

29

*Ferguson*, 2 S.W.3d 912 (Tenn. 1999), the Court finds that the [D]efendant will not be denied a fundamentally fair trial without the evidence. *Ferguson* provides that the Court should consider the following factors in making that determination: (1) the degree of negligence involved, (2) the significance of the destroyed evidence, considered in the light of the probative value and reliability of secondary or substitute evidence that remains available; and(3) the sufficiency of the other evidence used at trial to support the conviction. *Id.* at 917.

In this case, the Court finds there was no negligence on the part of the State. The Court finds that though there is no exact limit on how long evidence should be preserved, that keeping evidence for five years after the entry of a guilty plea and following the affirmation of the judgments by the State's highest court, was sufficient in this case.

For the second factor, obviously the destroyed evidence is significant, however, there is no proof that it would have been exculpatory or conclusive evidence.

The State submitted for the Court's consideration the deposition testimony of the investigating detective taken April 5, 2012 and had the Court consider prior testimony that had been given at a bond hearing which included the [D]efendant's statements to the police following his arrest in which he makes admission about the crimes. Furthermore, the victim in the case has provided deposition testimony regarding the alleged crimes should she be unavailable for trial and is able to identify the [D]efendant. The State asserts that in addition to that evidence, the [D]efendant was found with the victim's car keys, her vehicle was in front of the house in which he was found, and a fingerprint of his was located inside the vehicle. The Court finds that there is sufficient other evidence linking this [D]efendant to these allegations available for trial beyond the destroyed rape kit.

We agree with the trial court that this case presents a factually unique set of circumstances. The Defendant pled guilty in 1995, he filed a petition for post-conviction relief which the post-conviction court denied, this Court affirmed, and the Tennessee Supreme Court affirmed in 1999. Shortly thereafter, in 2000, the rape kit was destroyed as part of a routine cleaning of files. Subsequently, the Defendant filed several more post-conviction petitions and a petition for habeas corpus relief, which was ultimately successful. Under these circumstances, we agree with the trial court that the State did not have a duty to preserve this evidence.

30

Were we to conclude otherwise, we would then have to engage in an analysis of the aforementioned factors to determine the consequence of the State's breach of its duty. Nevertheless, looking to those factors, we first conclude that the State was not negligent in destroying the evidence. The Defendant pled guilty, his case was affirmed on post-conviction, and State sought a court order approving of the evidence's destruction, which a trial court signed before the State destroyed the evidence. The second factor, addressing the significance of the destroyed evidence, weighs in favor of the Defendant. This evidence would clearly be significant. The third factor, the sufficiency of the other evidence supporting the conviction, strongly weighs in favor of the State. The Defendant was found in a house where the victim's car was parked, and his fingerprints were on the car, the trunk, and the weapon. The victim identified the Defendant in a photographic lineup as the rapist, and the Defendant confessed to the crime on multiple occasions to multiple officers after being given his *Miranda* warnings. There was, therefore, sufficient other evidence supporting his conviction. Accordingly, we conclude that the trial court did not err when it denied the Defendant's motion to dismiss this case, and he is not entitled to relief on this issue.

### 3. DNA Issue

The Defendant contends that the trial court erred when it ruled that, if the Defendant presented evidence that the DNA evidence had not been tested, then the State would be allowed to present evidence that the Defendant had previously pled guilty in this case. The State counters that the trial court properly exercised its discretion when it ruled that the arguments concerning the lack of DNA testing were not relevant, were misleading, and were unfairly prejudicial to the State if evidence of the Defendant's guilty plea was inadmissible to explain why the State never tested the DNA.

The trial court excluded this information as not relevant pursuant to Tennessee Rule of Evidence 401 and as misleading pursuant to Tennessee Rule of Evidence 403.

Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence. *State v. Flood*, 219 S.W.3d 307, 316-17 (Tenn. 2007). Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony. *See Chambers v. Mississippi*, 410 U.S. 284 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000). In *Washington v. Texas*, 388 U.S. 14 (1967), the United States Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present

31

the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. at 19.

The right to offer testimony, however, is not absolute: "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence . . . ." *Chambers*, 410 U.S. at 302. Rules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process. *Id*. So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense. *Flood*, 219 S.W.3d at 317 (citations omitted). Because "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," *Scheffer*, 523 U.S. at 308, "[a]n evidentiary ruling ordinarily does not rise to the level of a constitutional violation." *State v. Rice*, 184 S.W.3d 646, 673 (Tenn.2006).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Pursuant to Rule 401, evidence is deemed relevant if it has "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *See State v. Forbes*, 918 S.W.2d 431, 449 (quoting Tenn. R. Evid. 401). In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-8 (4th ed. 2000). After the trial court finds that the proffered evidence is relevant, it then weighs the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial. *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002). If the court finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403. "'[E]xcluding relevant evidence under [Tennessee Rule of Evidence 403] is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." *James*, 81 S.W.3d at 757-58 (quoting *White v. Vanderbilt Univ*., 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999) (citations omitted)).

We first turn to decide whether the evidence that there was no DNA testing of the "rape kit" is relevant. The trial court held that this evidence was not relevant, given the

reason for the lack of DNA testing. The Defendant confessed to the crimes upon arrest shortly after he committed the crimes. Despite the wealth of evidence against the Defendant, law enforcement officers still brought the victim to the hospital for a medical examination, that included a "rape kit." When the Defendant pled guilty, however, the State had no reason to further use State resources to test the DNA evidence in the kit. Ultimately, that kit was destroyed. We conclude that the trial court did not abuse its discretion when it determined that evidence that the State failed to test the DNA evidence was not relevant. Even were we to conclude otherwise, we agree with the trial court that the evidence, presented alone, would be misleading.

Even if the evidence meets the test of relevance, however, Tennessee Rule of Evidence 403 may still justify exclusion of such evidence. Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We agree with the trial court that "to specifically allow the questioning concerning the lack of DNA testing when we all know . . . why there was not DNA testing would be extremely misleading and confusing to the jury." Accordingly, the trial court properly excluded this evidence. The Defendant is not entitled to relief on this issue.

### 4. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for two counts of aggravated rape in Counts 6 and 7 because the State did not prove that he was armed with a weapon or anything the victim reasonable believed was a weapon. The Defendant contends that, while the victim testified that she saw the weapon during the first series of rapes, she said that she "never saw a weapon during the incidents that formed the basis for the [aggravated rape] convictions in [C]ounts 6 and 7," i.e., the second set of rapes. The State counters that, viewed in the light most favorable to the State, a reasonable juror could conclude that the Defendant was armed with a weapon or an item used to lead the victim to reasonably believe it was a weapon during the commission of the offenses in Counts 6 and 7.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State*

*v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Aggravated rape "is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by . . . [f]orce or coercion . . . and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon . . . ." T.C.A. § 39-13-502. Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" T.C.A. § 39-13-501(7). Coercion "means a threat, however communicated, to[ ] . . . commit any offense[,]" and force "means compulsion by the use of physical power or violence." T.C.A. § 39-11-106(a)(3)(A), (a)(12).

The aggravated rape charges in Counts 6 and 7 were based upon the events that occurred when the Defendant parked behind a brick building and, for the second time, forced the victim to perform fellatio on him and then vaginally raped her. The evidence, viewed in the light most favorable to the State, proved that the Defendant, armed with a BB gun that by all accounts looked like a .45 pistol, approached the victim in her gym parking lot. He forced her to get into the car, held the gun in his lap, and he informed the victim the gun had a "hair trigger." The Defendant took the victim to the Hermitage, held the gun to her head, and demanded that she perform upon him oral sex. The Defendant then vaginally raped her. The Defendant forced the victim into the trunk and then drove around for an extended period of time, stopping behind a brick building. When the Defendant stopped, the victim testified that she ensured she was facing the opening of the trunk so that it would be more difficult for the Defendant to shoot her. Instead of shooting her, he got her out of the trunk and again forced her to engage in oral and vaginal sex. During the duration of her captivity, the Defendant threatened to shoot and or kill the victim on multiple occasions. When the Defendant was arrested, the gun was on the front passenger floor board of the victim's vehicle.

We conclude that this evidence is sufficient to prove that the Defendant unlawfully sexually penetrated a victim using force or coercion and while he was armed with a weapon. The Defendant is not entitled to relief on this issue.

## 5. Double Jeopardy

The Defendant next asserts that the trial court erred when it allowed separate convictions for aggravated rape in Counts 3 and 4 and attempted aggravated rape in Count 5 because separate convictions for these offenses violate his protections against double jeopardy. The Defendant was convicted of two counts of aggravated rape and one count of attempted aggravated rape for his actions toward the victim while the two were parked at the Hermitage. The jury convicted the Defendant in Count 3 for aggravated rape by forcing the

35

victim to perform fellatio upon him. The jury convicted the Defendant in Count 4 for vaginally raping the victim. In Count 5, the jury convicted the Defendant for attempting to penetrate the victim's anus with his penis. The Defendant alleges that these were all part of the same criminal episode, making his multiple convictions in violation of double jeopardy protections. The State counters that the convictions were based upon separate and distinct sexual acts and that they did not arise from the same act or transaction. Therefore, the State contends, double jeopardy is not implicated.

Both the United States and Tennessee Constitutions protect against twice being put in jeopardy for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. The double jeopardy clause contains three protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996).

In *State v. Watkins*, 362 S.W.3d 530, 556 (Tenn. 2012), our Supreme Court laid out the analysis we are to undertake:

> The first step of the *Blockburger* test is the threshold question of whether the convictions arise from the same act or transaction. This threshold question should be answered by reference to the charging instrument and the relevant statutory provisions. Here it is appropriate to consider whether the charges arise from discrete acts or involve multiple victims. Thus, what was formerly the third *Denton* factor now appropriately has a role to play in the threshold inquiry. If the convictions do not arise from the same act or transaction, there cannot be a violation of the double jeopardy protection against multiple punishment. Thus, a threshold determination that multiple convictions do not arise from the same act or transaction ends the inquiry and obviates the need for courts to further analyze double jeopardy claims . . . .

> If the threshold is surpassed, meaning the convictions arise from the same act or transaction, the second step of the *Blockburger* test requires courts to examine the statutory elements of the offenses. If the elements of the offenses are the same, or one offense is a lesser included of the other, then we will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy. However, if each offense includes an element that the other does not, the statutes do not define the "same offense" for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments.

36

*Id.* at 556-57.

"Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense." *State v. Phillips*, 924 S.W.2d 662, 665 (Tenn. 1996). In determining whether two or more unlawful sexual acts may be the subject of separate conviction, our Supreme Court has suggested consideration of the following factors:

> 1. Temporal proximity-the greater the interval between the acts, the more likely the acts are separate;

> 2. Spatial proximity-movement or repositioning tends to suggest separate acts;

> 3. Occurrence of an intervening event - an interruption tends to suggest separate acts;

> 4. Sequence of the acts-serial penetration of different orifices as distinguished from repeated penetrations of the same orifice tend to suggest separate offenses; and

> 5. The defendant's intent as evidence by conduct and statements.

*State v. Barney*, 986 S.W.2d 545, 548-49 (Tenn. 1999).

In the case under submission, each count was for a series of penetrations of different orifices. To support Count 3, the proof showed the Defendant, after driving to the Hermitage and parking the car, unzipped his pants and pulled them down. He placed the gun to the victim's head and pulled her head toward his penis and then penetrated her mouth with his penis. The proof supporting Count 4 showed that, after the fellatio occurred, the Defendant told the victim to get out of the car and take her pants off. He bent the victim over the hood of the car, and he attempted to perform anal sex upon her. The victim said she clamped down the muscles of her rectum so that the Defendant would be unable to penetrate her. He spit on her back and used it for lubrication and repeatedly attempted anal sex but was unable to penetrate her successfully. The proof supporting Count 5 showed that, after the attempted anal sex, the Defendant forced the victim into the backseat of the car, where she laid face down. The Defendant then vaginally penetrated her while he was behind her.

These three acts were separate and distinct acts. The acts were separated by time and location, each occurring in a separate part of the car. The Defendant penetrated the victim in three different orifices. Accordingly, we conclude that these acts did not arise from the same transaction. Our inquiry need not go further as double jeopardy is not implicated. The

Defendant is not entitled to relief on this issue.

## 6. Sentencing

The Defendant contends that the trial court erred when it sentenced him in two respects. First, he asserts the trial court erred when it ordered partial consecutive sentencing because the length of his effective sentence was not necessary to protect the public. Second, he asserts that the trial court erred when it ordered him to serve his sentence for especially aggravated kidnapping at 100 percent. The Defendant asserts that he committed his offense on March 15, 1995, and that such a release eligibility percentage is not authorized for offenses committed before July 1, 1995. The State concedes the error, and it asks this Court to modify the Defendant's sentence for especially aggravated kidnapping to reflect a release eligibility of 30 percent. The State asks this Court to affirm the trial court's sentencing decision for the Defendant's remaining convictions.

### a. Consecutive Sentencing

The trial court in this case sentenced the Defendant to serve twenty years for: Count 1, especially aggravated kidnapping, and twenty years for each of the aggravated rape convictions in Counts 3, 4, 6, and 7. The trial court imposed a sentence of ten years in Count 2, aggravated robbery, and Count 5, attempted aggravated rape. The trial court found that the Defendant was a "dangerous offender" and imposed partial consecutive sentences. It ordered that the Defendant's sentences for Counts 1, 3, 4 and 5 be served consecutively. The trial court ordered Counts 2, 6 and 7 to run concurrently with the sentences in Counts 1, 3, and 4, for a total effective sentence of 70 years.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness." 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.;

*State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. In other words, so long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707. Further, we review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. James Allen Pollard*, –S.W.3d–, No. M2011-0032-SC-R11-CD (Tenn. Dec. 20, 2013).

Consecutive sentencing is a matter addressed to the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn.Crim.App.1984). A trial court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the seven statutory factors exists. T.C.A. § 40-35-115(b)(1)-(7) (2010). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), -103(2) (2010); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

In this case, the trial court found, "[t]he [D]efendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(4) (2010). Our Supreme Court has noted that the "dangerous offender" category is the hardest and most subjective to apply. *State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999). Consequently, our Supreme Court in *State v. Wilkerson* held that "particular facts" must show the following in order to base consecutive sentencing on subsection 115(b)(4): (1) that an extended sentence is necessary to protect the public against further criminal conduct by the defendant; and (2) that the consecutive sentences reasonably relate to the severity of the offenses committed. 905 S.W.2d 933, 938-39 (Tenn. 1995); *see State v. Robinson*, 146 S.W.3d 469, 524 (Tenn. 2004). Further, *Wilkerson* instructs that the "dangerous offender" category should only be imposed if four factors are satisfied: (1) the defendant's behavior indicated little or no regard for human life; (2) he did not hesitate to act when the risk to human life was high; (3) extended confinement is necessary to protect society; and (4) the total length of the sentence must reasonably relate to the conviction offenses. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn.2002); *Wilkerson*, 905 S.W.2d at 939.

When the trial court in this case found that the Defendant qualified as a "dangerous offender" it stated:

Why is that: Well, I've already mentioned some of that, but obviously these were, under our law, and we can deal with this later as well. But in the Court's opinion, separate and distinct sexual acts at different times during the course of the night and early morning hours, different physical locations, in terms of street locations, different locations within the car, outside the car and/or different various parts of [the victim's] body, as I've already indicated, were invaded, I guess, by [the Defendant].

I mean, to [m]e, without getting to blunt here, I mean things that were done to [the victim], most of society wouldn't do to an animal. I mean, most people wouldn't take their dog and shove it in the trunk for hours at a time, or obviously don't want to get too far afield here, but other things that were done to [the victim] would not be done to anything else, much less another human being.

So the Court does find that consecutive sentencing is required in this particular case, under the *Wilkerson* factors, State versus *Wilkerson*, in terms of an aggregate term of sentence reflecting the severity of the offenses, in order that [the Defendant] not be out an [sic] inflicting this type of serious criminal conduct on anyone else.

Yes, as I've already indicated, he was youthful, but there are some crimes, and these occurred, as I've already indicated, over a long period of time. [The victim] in her trunk, with being a diabetic, her words were stifling, in terms of being able to breathe, threatened multiple times with a weapon to her head. I mean, you could go on and on, just recount all of [the victim's] testimony, basically.

And . . . What is [the Defendant], what is his judgment in terms of what should occur, goes to his girlfriend's house and does whatever, and falls asleep, and is apprehended by the police. Well, what happened to [the victim]? Well, I don't know, I don't care. Well, luckily she was able to get herself out of the trunk and notify law enforcement. So obviously in the Court's opinion consecutive sentencing is appropriate.

We conclude that the trial court did not err when it ordered partial consecutive sentencing. The trial court considered and articulated how the Defendant's actions satisfied each of the *Wilkerson* factors. The court's findings were not an abuse of its discretion. The Defendant is not entitled to relief on this issue.

## b. Especially Aggravated Kidnapping Sentence

The Defendant next asserts the trial court erred when it ordered him to serve his sentence for Count 1 especially aggravated kidnapping at 100 percent. The Defendant committed his offense on March 15, 1995. Tennessee Code Annotated section 40-35-501(i)(1), states that a defendant that commits especially aggravated kidnapping on or after July 1, 1995, shall not have any release eligibility and shall serve 100 percent of the sentence imposed by the court. Because the Defendant's crime occurred before the July 1, 1995, date, the trial court was not authorized by statute to impose a release percentage of 100 percent.

Accordingly, the Defendant's sentence for especially aggravated kidnapping should be modified to reflect a release eligibility of 30 percent. We note that the Defendant's sentences in Counts 3, 4, 6, and 7 are still to be served at 100 percent, and the Defendant's total effective sentence is still seventy years.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments in all respects save one. The trial court's judgment in Count 1, especially aggravated kidnapping, should be modified to reflect a release eligibility date of 30 percent, and we remand to the trial court for the entry of a modified judgment in Count 1.

_____
ROBERT W. WEDEMEYER, JUDGE